2004 PARKER FAMILY LP; BRAHK LIMITED, INC. DBP; FDHAA PROPERTIES LTD.; ROBERT MCIVER AND PATRICIA STIRLING, et al.,, Plaintiffs,

against
BDO USA LLP, BDO CAYMAN LTD., COHNREZNICK LLP, COHNREZNICK (CAYMAN), and SS & C TECHNOLOGIES, INC.,, Defendants.

Index No. 657152/2019 

Barry Ostrager, J.

Plaintiffs, a group of 95 investors, commenced this action to redress their investment losses related to certain Platinum Partners Value Arbitrage Funds ("the PPVA Funds") triggered by the collapse and liquidation of the PPVA Funds in or about 2016. Defendants BDO USA, LLP ("BDO USA") and BDO Cayman, Ltd. ("BDO Cayman") (together, "BDO") were the independent auditors for the PPVA Funds covering financial statements from at least 2008 through 2013. Defendants CohnReznick LLP and CohnReznick (Cayman) Certified Public Accountants (together, "CohnReznick") replaced BDO as the auditors beginning with the 2014 financial statements. Defendant SS & C Technologies, Inc. ("SS & C") served as Administrator for the PPVA Funds throughout the period at issue.
Before the Court are motions by CohnReznick (mot. seq. 003) and BDO (mot. seq. 004) to compel the arbitration of the claims asserted here against them pursuant to CPLR § 7503(a). For the reasons stated below, both motions are granted. And because the claims against CohnReznick and BDO will be determined at arbitration, the moving defendants agree that their separately filed motions to dismiss (seq. 007 and 006, respectively) are moot.
Discussion
In their 204-page Complaint (NYSCEF Doc. No. 2), plaintiffs assert three causes of action against BDO USA (the First, Second and Third Claims for Relief), three against BDO Cayman (the Fourth, Fifth and Sixth Claims for Relief) and three against CohnReznick (the [*2]Seventh, Eighth and Ninth Claims for Relief).[FN1]
For the most part, each set of three claims is identical. The first claim against each defendant sounds in negligence, alleging that the defendant auditor breached its duty of care to plaintiffs by failing to properly audit the PPVA Funds, knowing plaintiffs would rely on the audit reports and causing economic injury. The second claim against each defendant auditor - and the most significant one to these motions - is titled "Third-Party Breach of Contract". There plaintiffs allege they are "third-party beneficiaries" of the contracts between the auditors and the PPVA Funds and that the auditors breached the contracts by failing to properly audit the PPVA Funds, knowing the audit reports would be sent to plaintiffs in connection with their investment decisions and causing plaintiffs economic injury. The third claim against each defendant auditor is that the auditor aided and abetted Platinum Management's breach of fiduciary duty by failing to properly audit the PPVA Funds and detect and disclose to plaintiffs evidence of material misrepresentations by Platinum related to the valuation of its funds.
In their motions to compel arbitration, CohnReznick and BDO (hereafter, "the Auditors") rely on the same propositions of law. The Auditors assert that, because plaintiffs expressly allege in their Complaint third-party beneficiary status under the Engagement Agreements between the Auditors and Platinum Management, plaintiffs are bound by the arbitration provisions in those Agreements, even though they are not signatories to the Agreements. Plaintiffs respond that they would agree to arbitrate if the Auditors would agree that plaintiffs are third-party beneficiaries of the Engagement Agreements. Absent such an agreement, plaintiffs contend they cannot fully respond to the Auditors' arguments without some discovery. To the extent they do offer arguments on the merits, plaintiffs point to the general rule that nonsignatories can only be bound to arbitration agreements in limited circumstances, and they question whether such circumstances exist here allowing for the exception to the general rule which would otherwise protect the right of plaintiffs as nonsignatories to their day in court.
The Engagement Agreements on which both sides rely are varied in number but effectively the same in content; that is, they all contain broad arbitration clauses. CohnReznick relies on five different Engagement Agreements, all dated March 12, 2015 but each referring to a different Fund: the PPVA International Feeder Engagement Letter; the PPVA Master Fund Engagement Letter; the PPVA US Feeder Engagement Letter; the PPVA International Feeder (Cayman) Engagement Letter; and the PPVA Master Fund (Cayman) Engagement Letter (NYSCEF Doc. Nos. 29-33). Each Agreement consists of a letter referencing the particular Fund and a three-page generic document entitled "Terms and Conditions." The arbitration provision at issue here is entitled "Dispute Resolution" and states in relevant part (with emphasis added) that:

Any dispute, controversy, or claim arising out of or relating to the services or the performance or breach of this Agreement (including disputes regarding the termination, validity or enforceability of this Agreement) or any prior services or agreements between the parties shall be finally resolved by arbitration in accordance with the International Institute for Conflict Prevention and Resolution ("IICPR") Rules for Non-Administered Arbitrations by a panel of three arbitrators, one chosen by each party, and the third [*3]selected by the two party-selected arbitrators. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof. The arbitration hearings will take place in New York, New York unless the parties agree to a different locale.
BDO submits twelve Engagement Letters spanning the period from November 6, 2008 through September 27, 2013 ("the BDO Agreements". NYSCEF Doc. Nos. 39-50). The BDO Agreements are somewhat individualized based on the particular PPVA Fund and the particular BDO entity (BDO Tortuga, BDO Cayman, BDO Seidman, and BDO USA). However, they are all similar in that the provisions in the Dispute Resolution Procedure section are broadly worded to encompass virtually all types of disputes. Further, in each case the Procedure calls for either "facilitated negotiations" (Doc. Nos. 39, 45 and 48) or "non-binding mediation" as a first step to resolve disputes (Doc. Nos. 40-44, 46, 47, 49 and 50). All the BDO Agreements also provide that the parties shall proceed to arbitration should the first step in the Dispute Resolution Procedure fail to resolve the controversy, stating in relevant part (with emphasis added) that:

If any dispute, controversy, or claim arises out of, relates to, or results from the performance or breach of this Agreement, excluding claims for non-monetary or equitable relief (collectively, the "Dispute"), either party may, upon written notice to the other party, request non-binding mediation. . . . Any Dispute not resolved first by mediation between the parties (or if the mediation process is waived as provided herein) shall be decided by binding arbitration.[FN2]

The provision goes on to specify the locale (e.g., New York or Cayman Islands) and the procedural and substantive law governing the arbitration.
In sum, all the Engagement Agreements mandate the arbitration of disputes between the particular auditor and the particular PPVA Fund that signed the Agreement. But the question here is whether the Auditors can bind plaintiffs to those arbitration provisions when it is undisputed that plaintiffs did not sign any of the Agreements.
As the First Department recently emphasized in KPMG LLP v Kirschner, 182 AD3d 484 (2020), quoting Matter of 215-219 W. 28th St. Mazal Owner LLC v Citiscape Bldrs. Group Inc., 177 AD3d 482, 483 (1st Dept 2019): "The issue of whether a party is bound by an arbitration provision in an agreement it did not execute is a threshold issue for the court, not the arbitrator, to decide." The principles the Court must apply in making that determination were clearly set forth by the Court of Appeals in Matter of Belzberg v Verus Invs. Holdings Inc., 21 NY3d 626, 630-31 (2013) (citations omitted):
Arbitration is a matter of contract "grounded in agreement of the parties" As a consequence, notwithstanding the public policy favoring arbitration , nonsignatories are generally not subject to arbitration agreements . However, under limited [*4]circumstances nonsignatories may be compelled to arbitrate . Some New York courts have relied on the direct benefits estoppel theory, derived from federal case law, to abrogate the general rule against binding nonsignatories Under the direct benefits theory of estoppel, a nonsignatory may be compelled to arbitrate where the nonsignatory "knowingly exploits" the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement .
Where the benefits are merely "indirect," a nonsignatory cannot be compelled to arbitrate a claim. A benefit is indirect where the nonsignatory exploits the contractual relation of the parties, but not the agreement itself The Court here agrees with the Auditors' assertion that plaintiffs may be compelled to arbitrate because they knowingly exploited the benefits of the Engagement Agreements by asserting claims against the Auditors expressly based on those Agreements. The clearest example is the cause of action titled "Third-Party Breach of Contract" wherein plaintiffs explicitly allege they are "third-party beneficiaries" of the contracts between the Auditors and the PPVA Funds and that the Auditors breached the contracts by failing to properly audit the PPVA Funds, knowing the audit reports would be sent to plaintiffs in connection with their investment decisions and causing plaintiffs economic injury. Plaintiffs begin that claim by directly referencing the Agreements between the Auditors and the Funds. They cite the Auditor's contractual duty to properly perform the audits. They go on to allege that the Auditors "understood that Plaintiffs relied on [the Auditors] to conduct a proper audit of the PPVA Funds in accordance with GAAS, GAAP, and other applicable auditing standards, and accurately opine that the financial statements fairly represented the financial condition of the PPVA Funds. The benefits to Plaintiffs under the contracts were immediate, not simply incidental." Plaintiffs add that the Auditors' failure to fulfill their contractual duty to conduct proper audits "proximately caused Plaintiffs to lose all or, substantially all, of their investments in the PPVA Funds." And they conclude that the Auditors are therefore "liable to Plaintiffs as third-party beneficiaries of those contracts." (Complaint ¶¶ 568-574, 589-595, and 611-618).
Where, as here, plaintiffs expressly rely on the Auditors' contracts with the Funds to seek compensatory damages related to their investment losses, they "may not pick and choose which provisions suit its purposes, disclaiming part of a contract while alleging breach of the rest." God's Battalion of Prayer Pentecostal Church, Inc. v Miele Assocs., LLP, 6 NY3d 371, 374 (2006) (plaintiff was bound by the arbitration provision in the contract, even though it had not signed the contract, where it relied on the contract and brought suit specifically alleging the contract had been breached); see also Arrowhead Golf Club, LLC v Bryan Cave, LLP, 59 AD3d 347 (1st Dept 2009) (plaintiff's adoption of the retainer agreement as the basis for its claims signaled its intent to be bound by the arbitration clause in the agreement).
Particularly persuasive is the Auditors' reliance on Matter of Long Is. Power Auth. Hurricane Sandy Litigation, 165 AD3d 1138 (2nd Dep't 2018). In that putative class action, the plaintiffs sued to recover, among other things, compensatory damages from Long Island Power Authority ("LIPA") and its former management services provider, National Grid Electric Services, LLC ("National Grid"), claiming they suffered damages as a result of the interruption [*5]of electric services that occurred in the wake of the October 2012 storm known as Hurricane Sandy. As explained by the Appellate Division, plaintiffs in their complaint specifically relied on the Management Services Agreement between LIPA and National Grid ("the MSA") pursuant to which National Grid was responsible for the day-to-day operations and maintenance of LIPA's electricity transmission and delivery system.
As particularly relevant here, the Complaint in Matter of LIPA also alleged that the "plaintiffs were third-party beneficiaries" of the MSA since they were the "known and intended recipients of the electric service that [National] Grid was responsible for providing." The complaint further alleged that the plaintiffs sustained damages as a result of National Grid's breach of the MSA. 165 AD3d at 1139. The Appellate Division modified the trial court's decision and granted National Grid's motion to compel arbitration, even though plaintiffs were nonsignatories to the MSA between LIPA and National Grid containing the arbitration clause, because plaintiffs had expressly relied on the MSA in pursuing their claims. Directly applying the principles of law discussed above, the Court held (at p 1142) that:
Here, National Grid was responsible for the day-to-day operations and maintenance of LIPA's electricity transmission and delivery system pursuant to the MSA. The plaintiffs were paying customers of LIPA and the recipients of the electric service that National Grid was responsible for providing under the terms of the MSA. In this action, the plaintiffs seek to recover compensatory damages for interruptions of service that allegedly arose out of National Grid's breach of the MSA. National Grid thus demonstrated that the plaintiffs derived a direct benefit from the MSA and that the plaintiffs are explicitly relying upon the terms of that agreement to support their claims against National Grid. Accordingly, under these circumstances, the plaintiffs should be compelled to arbitrate in accordance with the arbitration clause contained in the MSA by application of the direct benefits theory of estoppel The similarities between Matter of LIPA and this case could not be more striking. In both cases, plaintiffs brought suit seeking compensatory damages based on an alleged breach of a services contract they did not sign. Yet they relied on the contract to bring suit, claiming they suffered damages due to the breach of contract. They further assert they received a direct benefit from the Agreements in that the audit reports were shared with plaintiff investors to provide information related to investment decisions. Thus, under the direct benefits theory of estoppel, and based on plaintiffs' assertion of third-party beneficiary rights under the Engagement Agreements between the Auditors and the PPVA Funds, plaintiffs are bound by the arbitration clause in the Agreements.[FN3]

This ruling applies to all three claims against the Auditors. The negligence and fiduciary [*6]duty claims plead the same essential facts as the third-party beneficiary breach of contract claim, albeit slightly tailored to state the elements of the particular cause of action. But all three causes of action rely on the same duty of the Auditors created in the first instance by the Engagement Agreements to properly audit the PPVA Funds. Moreover, the arbitration provision is a classically broad one, stating that arbitration is mandated for: " Any dispute, controversy, or claim arising out of or relating to the services or the performance or breach of this Agreement ..." As the Second Circuit stated in Collins & Aikman Prod. Co. v Bldg. Sys., Inc., 58 F3d 16, 20-21 (2d Cir. 1995) (with emphasis in the original) when discussing the scope of an arbitration clause:
In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims "touch matters" covered by the parties' ... agreements, then those claims must be arbitrated, whatever the legal labels attached to them.
Thus, applying the above-stated cases and principles of law, the Court will sever all the claims against the Auditors and direct that they proceed to arbitration. See In re Refco, Inc. Sec. Litig., 2008 WL 2185676 (S.D.NY May 21, 2008) (because the allegations in the complaint underlying the plaintiff's claims for malpractice, negligent misrepresentation, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty, all arise out of or relate to the services provided pursuant to the Engagement Letters containing the arbitration clause, they are all covered by the parties' arbitration agreement). The one caveat is that the BDO defendants must comply with the first step in the applicable dispute resolution procedure, whether it is facilitated negotiations or mediation, before proceeding with arbitration as discussed above.
Accordingly, it is hereby
ORDERED that the motion by defendants CohnReznick LLP and CohnReznick (Cayman) (seq. 003) and the motion by defendants BDO USA, LLP and BDO Cayman, Ltd. (seq. 004) to compel arbitration of the claims against them is granted to the extent provided herein, and the First through Ninth Causes of Action are severed for determination by arbitration. The balance of the action against Defendant SS & C Technologies, Inc. shall proceed.
Date: May 29, 2020



Footnotes

Footnote 1:The Tenth through Thirteenth Claims for relief will not be discussed here, as they relate to defendant SS & C, which is not involved in these motions.

Footnote 2:As indicated above, some of the BDO Agreements call for "facilitated negotiation" rather than "non-binding mediation" as the first step but all thereafter call for "binding arbitration" should the first step in the dispute resolution procedure fail.

Footnote 3:In light of this holding, the Court need not address BDO's argument that plaintiffs must proceed to arbitration because their claims are derivative in nature. Were the Court to reach the merits, the Court would reject that argument. Plaintiffs are suing only in their individual capacities to recover "compensatory damages to all Plaintiffs in an amount no less than the entire consideration paid by Plaintiffs for their respective interests in the PPVA Funds" (Complaint, Prayer for Relief, p 200). Thus, plaintiffs want their investments returned to them, not to the Fund, which appears to be a direct, and not a derivative, claim.